IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CAMERON J. AIKENS,               )
                                 )
          Plaintiff,             )
                                 )
     v.                          )          1:23-cv-757
                                 )
HERBALIFE INTERNATIONAL OF       )
AMERICA, INC.                    )
                                 )
          Defendant.             )

<u>MEMORANDUM OPINION AND ORDER</u>

**OSTEEN, JR., District Judge**

     Before this court is Defendant's Motion for Summary
Judgment, (Doc. 31), Defendant's Motion to Seal, (Doc. 33), and
Defendant's Motion to Strike, (Doc. 43). For the reasons stated
herein, Defendant's Motion to Strike will be granted in part and
denied in part, Defendant's Motion for Summary Judgment will be
granted, and Defendant's Motion to Seal will be denied.

**I.    <u>FACTUAL BACKGROUND</u>**

     At summary judgment, "[t]he evidence of the non-movant is
to be believed, and all justifiable inferences are to be drawn
in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
255(1986). "A party asserting that a fact cannot be or is
genuinely disputed must support the assertion by" either "citing
to particular parts of materials in the record" or by "showing

that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).[1]

This dispute revolves around Plaintiff's termination of employment with Defendant Herbalife International of America, Inc., a company that manufactures food and supplement products. (Pl.'s Ex. 4, Ted Collins Dep. (Doc. 39-4) at 10.)[2] Plaintiff was hired by Defendant on October 10, 2016. (Def.'s Ex. 1, Aikens Offer Letter (Doc. 34-1) at 2.) He was twice promoted, once on November 22, 2017, (Def.'s Ex. 2, Aikens Transfer Letter (Doc.

---

[1] It is concerning to this court that most of the evidence before it has been submitted without authentication and in some cases, without a clear basis for admissibility or a finding of relevance. However, as explained by another court in this district in Slate v. Byrd, the 2010 amendments to Federal Rule of Civil Procedure 56 "eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated." Slate v. Byrd, No. 1:09-cv-852, 2013 WL 1103275, at *2 n.5 (M.D.N.C. March 15, 2013), report and recommendation adopted as modified, No. 1:09-cv-852, 2013 WL 2474336 (M.D.N.C. June 10, 2013) (citation omitted). "Under the new rule, if the opposing party believes that [the cited] materials cannot be presented in a form that would be admissible in evidence, that party must file an objection." Id. (alteration in original) (internal quotation marks and citation omitted). Accordingly, in the absence of objections, this court will consider all evidence submitted.

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

34-2)), and again on June 14, 2018, to a "Quality Control Chemistry Lab Technician, (Def.'s Ex. 3, Position Transfer Letter (Doc. 34-3) at 2).

Plaintiff, as a Chemistry Lab Technician, was responsible for "performing routine physical analysis, compendial wet chemical testing as well as instrumental methods including automated titrimetric methods, spectrometric techniques and assisting chemists as required." (Def.'s Ex. 5, Job Description (Doc. 34-5) at 2.) He was required to "provide detailed written observations to management" and to "[i]nteract effectively with co-workers, management and vendors in order to resolve problems." (Id.) Plaintiff was further required to comport with Herbalife's "Good Documentation Practices" ("GDP"), (see Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8) at 16 ("I reminded [Plaintiff] he is going against our GDP . . . .")), which requires data entries to be "clearly written" and "documented at the time of performance/verification." (Def.'s Ex. 6, Good Documentation Practices (Doc. 34-6) at 2.)

From late 2019 through 2021, Plaintiff's work product and behavior were the subject of numerous complaints. The first documented complaint was on December 19, 2019, when Plaintiff's direct supervisor, Tanya Martin, received an email from David O'Brien, Supervisor of the Quality Control Chemistry Lab.

- 3 -

(Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8) at 2.)

O'Brien relayed that

> a reviewer [was] stressed by the recording of a
> Dextrose Equivalent completed by [Plaintiff]. . . .
> This method has been completed by [Plaintiff] 4 times
> recently with reviewers informing [Plaintiff] of the
> requirements for the test and the issues caused by
> not conducting the test properly. . . . Many questions
> have arisen about the legitimacy of the testing and
> the reviewers are uncomfortable reviewing tests
> conducted in this manner even with manage approval.

(Id.)

In response, Martin met with Plaintiff on February 5, 2020.
(Id. at 3.) According to Martin's notes, she "discussed with
[Plaintiff] that the expectations for his notebooks need to be
in good GMP[3] order. The write up needs to be consistent and make
sense. His data needs to be in chronological time stamp order.
If I see any examples of data out of order, HR will be
notified." (Id.)

On March 11, 2020, Martin again received an email from
O'Brien, who reported that he "received a complaint that
[Plaintiff's] write up for Dextrose Equivalent was back dated in
several areas." (Id. at 7.) Martin forwarded this email to two
Quality Control Department managers: Piyush Purohit and Corey

---

[3] "GMP" is Herbalife's shorthand for "Good Manufacturing
Practices." (See Def.'s Ex. 6, Good Documentation Practices
(Doc. 34-6) at 2.)

Eminger. (Id. at 6.) On March 13, 2020, Martin received an email from an Herbalife employee (name redacted) that stated: "I have had several complains [sic] on [Plaintiff] today. . . . People are just saying that everyone is busting butt here but trying to get things done and he is just taking his time doing everything." (Def.'s Ex. A, Internal Emails (Doc. 36-1) at 10.)

Martin again met with Plaintiff on April 28, 2020. (Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8) at 8.) According to her notes, they discussed, among other things, that "[Plaintiff] will start lab audits and cleaning up today and complete this every Tuesday and Thursday using the check list he provided." (Id.) She also "asked [Plaintiff] to send [her] daily emails of which methods he ran and how many samples he tested in each sample." (Id.) Martin also "mentioned that chit chat in the lab can be distracting and [Plaintiff] should be sure he is focusing on getting his work done first." (Id. at 9.) Martin noted that Plaintiff "asked about the next level above a [Quality Control] tech," which Martin told him was a "senior [Quality Control] tech," a role that she noted, "[Plaintiff] would like to work toward." (Id.) Martin forwarded details of this meeting to Eminger. (Id. at 8.)

On May 20, 2020, Martin and Plaintiff had another one-on-one meeting. (Id. at 11.) Martin followed up on the series of

- 5 -

expectations she laid out for Plaintiff in their April 28, 2020, meeting, asking Plaintiff why "the lab cleanliness audits [are] not being done as discussed," why Plaintiff has "only sent a few daily emails with tasks and test[s] he has completed for the day" despite being "asked almost a month ago to send them every day," and further, "why he had not done QCS failure forms for 2 QCS failures he had recently" because "failing to report a QCS OOS is a problem and goes against compliance procedures." (Id.) Martin also again reminded Plaintiff "to be mindful of his chit chatting and phone usage in the lab." (Id.) Finally, Martin

> let [Plaintiff] know that if he wants to be considered for a promotion to a Sr Chemistry Tech he will have to meet/exceed and maintain the expectations out lined above along with his usual job duties for an extended length of time(many months). [She] also shared that if the above expectations are not met HR and Corey [(Eminger)] would be notified.

(Id.) In Plaintiff's deposition, when asked if he remembered Martin telling him this, he responded "[y]es." (Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 11.) When asked if he did "meet or exceed the expectations outlined in [the] email," Plaintiff replied: "Yes. The senior manager, Piyush [(Purohit)], made me a subject matter expert in . . . every test. . . . If I was incompetent, he wouldn't have made me that or if Tanya [(Martin)] disagreed, she would have given pushback." (Id. at 13.)

On June 16, 2020, Martin again received an email from O'Brien regarding Plaintiff's work product. (Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8) at 12–13.) O'Brien explained that

> [Plaintiff]'s book . . . pages 98 and 99 have errors which are showing inconsistencies in the write up. The biggest issue is writing the number "2" in differing ways. This makes the write up inconsistent and should be corrected. The "2" was flagged for a write over which is evident. The response to the question of how the number "2" was written was most inappropriate "Lmao"[4] that response is not acceptable in any form. There appears to be intent to be inconsistent in the write up . . . ."

(Id. at 12.)

Martin met with Plaintiff on June 18, 2020, to discuss O'Brien's concerns. (Id.) Martin discussed with Plaintiff that "being consistent with his numbers and penmanship is expected." (Id.) She also "explained to him that his comments were unprofessional," and that "his comments need to be professional no matter where he writes them and he said he understood." (Id.)

On November 11, 2020, Martin noted that "[Plaintiff] had cartoons on the computer screen" while working in the lab. (Id. at 15.) Martin "reminded him videos are not to be played in the lab on the computer or phones." (Id.) According to Martin's notes, "Henry" had also "noted [Plaintiff] had videos pulled

_____

[4] LMAO is shorthand for "laughing my ass off." (Def.'s Br. (Doc. 34) at 8.)

upon the screen 11/06/20." (Id.) Also on November 11, Martin received an email from an employee (name redacted), who relayed that after telling a co-worker to complete a test assigned to Plaintiff, Plaintiff said "give my methods to her again and you'll see what will happen or you won't like what will happen," which made the employee "very uncomfortable." (Def.'s Ex. A, Internal Emails (Doc. 36-1) at 5.)

On December 3, 2020, Martin noted that Plaintiff's "handwriting continues to be sloppy and illegible." (Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8) at 16.) She reminded him "he is going against our [Good Documentation Practices] SOP to have illegible entries." (Id.) On December 10, 2020, Martin noted that "2nd shift wouldn't be reviewing [Plaintiff's] packets. He has too many errors and doesn't but [sic] his data in order." (Def.'s Ex. A, Internal Emails (Doc. 36-1) at 3.)

In "late 2020 or early 2021," HR was notified of "an incident when employees observed [Plaintiff] making what appeared to be gang signs with his fingers during a department team meeting." (MaryAnn Atkins Decl. (Doc. 36) ¶ 4.) According to HR Manager, MaryAnn Atkins, the incident "was addressed with [Plaintiff], and no further employment action by Human Resources was necessary." (Id.) In an email from Senior Director of Quality Control, Ted Collins, to Atkins, Collins relayed that

- 8 -

"[Plaintiff] indicated . . . he was not [making gang signs] and was instead fidgeting." (Def.'s Ex. A, Internal Emails (Doc. 36-1) at 2.)

In June 2021, HR was informed of reports that "[Plaintiff] had engaged in other inappropriate behavior towards female coworkers." (MaryAnn Atkins Decl. (Doc. 36) ¶ 5.) According to Atkins, two female employees reported that "while walking towards [them] in a hallway, [Plaintiff] gestured to in between his legs," and those female employees "could see [Plaintiff's] erect penis through his pants." (Id. at 6.) Plaintiff was subsequently put on leave while HR investigated the incident. (Id.) According to Atkins, the investigation revealed "other allegations of [Plaintiff's] inappropriate and disruptive behavior," and that "at least one female coworker had even decided to leave the team because of [Plaintiff's] behavior." (Id. ¶ 7.) Ultimately, however, HR was "unable to substantiate the female employees' allegations to a point where [HR] believed disciplinary action was warranted," although Collins and Atkins "met with [Plaintiff] to stress the absolute imperative that [he] conduct himself appropriately in the workplace going forward." (Id. ¶¶ 12–13.)

A compilation of undated notes from anonymous colleagues outlines a series of complaints about Plaintiff's work ethic and

behavior. One comment reads: "The Youtube is a daily thing for him now and it has been for a while now. (sometime more than 2 hours a day)[.] . . . Its watching videos and cartoons. Work a little, play around on the computer a lot . . . ." (Def.'s Ex. A, Internal Emails (Doc. 36-1) at 11.) Another comment reads: "He made the statement: She must be bleeding (referring that the attitude I had was coming from me on being on my monthly)." (Id.) Another reads: "[Plaintiff's] sexual discussions that he has in the lab is very disturbing. He has made comments about how we should all leave our husbands/boyfriends and get with him and how he can make us happy." (Id. at 12.)

Plaintiff, in his Response in Opposition to Summary Judgment, states: "As the record reflects every allegation of inappropriate behavior by the Plaintiff was investigated and they were all unfounded." (Pl.'s Resp. (Doc. 39) at 11.) He does not cite to any evidence to support this assertion. It is uncontroverted that HR was unable to substantiate the female employees' allegations against Plaintiff with respect to the incident where he allegedly gestured to his genitals. However, Plaintiff does not put forth any evidence to contradict Defendant's evidence that 1) his write-ups were often illegible and inaccurate, 2) he watched videos in the lab, 3) he wrote "LMAO" in his workbook, 4) he made comments to his colleagues

- 10 -

that made them uncomfortable, and 5) he was required to have one-on-one coaching with his supervisor because of these issues.[5]

In either 2020 or 2021, Plaintiff applied for a higher position at Herbalife, but a different applicant, a White woman, received the position. (Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 4–5; Corey Eminger Decl. (Doc. 37) ¶ 10.) In Plaintiff's deposition he said Corey Eminger told him that he did not receive the promotion because "[Eminger] didn't like the way [Plaintiff's] handwriting looked." (Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 6.) Eminger stated that he told Plaintiff he "could not approve someone for promotion that was not responding to feedback or coaching from his supervisor."

---

[5] Defendant submits 2019 and 2020 yearly performance evaluations for Plaintiff. (See Def.'s Ex.7, 2019 Performance Review (Doc. 34-7); Def.'s Ex. A, 2020 Performance Review (Doc. 37-1).) Although they are generally positive, the 2020 review states that Plaintiff "has been coached multiple times this year on the quality of his write ups and GDP . . . . A few behavior issues have been addressed this year that were causing distractions for the team." (Def.'s Ex. A, 2020 Performance Review (Doc. 37-1) at 9.) Additionally, in his deposition, Collins stated: "We wo[u]ld normally not document all performance issues in anyone's performance review." (Pl.'s Ex. 4, Ted Collins Dep. (Doc. 39-4) at 17.) Plaintiff does not dispute that he was coached on the accuracy and legibility of his write-ups. Nor does Plaintiff dispute that he engaged in disruptive behavior in the lab, such as watching videos. Plaintiff only argues that "every allegation of inappropriate behavior by the Plaintiff was . . . unfounded," although does not cite to the record to support such a dispute of fact. (Pl.'s Resp. (Doc. 39) at 11.)

- 11 -

(Corey Eminger Decl. (Doc. 37) ¶ 12.) Further, Eminger relayed that Martin "decided that the other applicant was more qualified for the position." (Id. ¶ 10.) Plaintiff, in his deposition, also said Martin told him the other applicant was "a better, qualified candidate." (Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 12-13.)[6]

In 2021, Defendant hired Data Dome, Inc. ("Data Dome"), a company that, according to its President, Lisa Bouchard, "conducts, among other things, organizational training and development programs designed to help its clients make better hires, develop leaders into their full potential, and build stronger teams." (Lisa Bouchard Decl. (Doc. 35) ¶¶ 3-4; see also

---

[6] Plaintiff submitted an affidavit from his former co-worker Johnna Burns, in which she states that "[Plaintiff] was passed over for promotions several times. [He] applied for a Chem I role, but was denied for lack of experience. Management hired a Caucasian woman without experience for the same role." (Pl.'s Ex. 2, Johnna Burns Aff. (Doc. 39-2) ¶¶ 10-11). Defendant asks this court to disregard these statements arguing they are "not based on personal knowledge" as required by Federal Rule of Civil Procedure 56(c)(4), which states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge." (Def.'s Reply (Doc. 42) at 3-4.) Defendant argues that there is nothing in the record to support how Burns, who was "not a member of management, would have any personal knowledge" as to this employment decision. (Id. at 4.) This court agrees. Plaintiff has provided no evidence that Burns would be personally aware of the qualifications of the other applicant or what considerations went into the employment decision. This court will disregard paragraphs ten and eleven of Burns's affidavit.

Def.'s Ex. 10, Ted Collins Dep. Excerpts (Doc. 34-10) at 5.)
Data Dome conducted a nine-month program at Herbalife designed
to address "uncooperative teamwork between first and second
shift," and "individuals . . . making assumptions and
presenting them as facts." (Pl.'s Ex. 4, Ted Collins Dep. (Doc.
39-4) at 42.) Throughout the program, Plaintiff appeared
"disinterested and disengaged." (Lisa Bouchard Decl. (Doc. 35)
¶ 11.) He "regularly arrived late to the sessions, would not sit
with the group, and would not participate." (Id.) The nine-month
program culminated on November 4th and 5th with a widely
attended two-day presentation. (Pl.'s Ex. 4, Ted Collins Dep.
(Doc. 39-4) at 51-52; Corey Eminger Decl. (Doc. 37) ¶ 18; Lisa
Bouchard Decl. (Doc. 35) ¶ 9.)

On November 4, 2021, the first day of the Data Dome final
presentation, it is undisputed that Plaintiff either made a
statement or asked a question about promotions ("Data Dome
incident"). However, the parties dispute what Plaintiff said and
how he said it.

Plaintiff stated in his deposition:

I expressed at the meeting . . . how come minorities
don't get the same opportunity to move up as
Caucasians based on the work history and from what I
was told when people expressed their concerns to me.
. . . I said it to Lisa Brouchard [sic]. . . . She
ignored the question and proceed [sic] and skipped
over me because we was going in a circle asking
questions from left to right.

- 13 -

(Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 7.)[7] Plaintiff

has submitted evidence supporting this recollection of the Data

Dome incident. In an affidavit, Plaintiff's co-worker, Johnna

Burns, stated that she "was present during the Data Dome Meeting

on November 4, 2021 when [Plaintiff] openly asked questions

about the validity of the promotional process and specifically

whether minorities were being passed over for promotions because

of their race." (Pl.'s Ex. 2, Johnna Burns Aff. (Doc. 39-2) ¶

3.)[8] Additionally, as seen in a screenshot of an email, Tiffaney

Bledsoe wrote that she and Plaintiff "were in a meeting where

_____

[7] Plaintiff's report of what he said at the meeting is
inconsistent. (Compare Aikens Dep. Excerpts (Doc. 34-9) at 15
("I said . . . I was told that they only promote their favorites
and their friends), with id. at 19 ("I said minorities, not
favoritism.").)

[8] Burns stated in her affidavit that she was present at the
Data Dome meeting. (Pl.'s Ex. 2, Johnna Burns Aff. (Doc. 39-2) ¶
3.) But Plaintiff stated in his deposition that "Johnna . . .
wasn't at my Data Dome meeting." (Def.'s Ex. A, Aikens Dep.
Excerpts (Doc. 42-1) at 7.) Based on this discrepancy, Defendant
asks this court to disregard Burns's statements about the Data
Dome incident, arguing that because she was not present, her
statements are "not based on personal knowledge" as required by
Federal Rule of Civil Procedure 56(c)(4), see supra n.6. (Def.'s
Reply (Doc. 42) at 3-4.) In so arguing, Defendant asks this
court to credit Plaintiff's sworn statements over Burns' sworn
statements. But "[c]redibility determinations . . . are jury
functions, not those of a judge." Anderson, 477 U.S. at 255. The
fact that these statements directly conflict is concerning. But
"submitting an affidavit that presents a conflict does not, by
itself, violate any of the provisions of Rule 56(c)." Biggs v.
Edgecombe Cnty. Pub. Sch. Bd. of Educ., No. 4:16-cv-271, 2020 WL
594098, at *1 (E.D.N.C. Feb. 6, 2020). This court need not
disregard these statements.

[Plaintiff] expressed concern and questioned why minorities do not have the opportunity of promotion that was observed with Caucasians." (Pl.'s Ex. 7, Emails and Text Messages (Doc. 39-7) at 2.)

Defendant's evidence paints a different picture of the Data Dome incident.[9] Bouchard stated that "[Plaintiff] at one point interrupted the Department Director's [(Collins)] presentation of the promotions lattice to accuse Herbalife management of only promoting employees that were their 'friends' and who participated in a cross-fit workout program." (Lisa Bouchard Decl. (Doc. 35) ¶ 14.) Bouchard denied "ever hear[ing] [Plaintiff] . . . complain that minorities were treated differently than others with respect to promotions, or anything else." (Id. ¶ 20.) According to Eminger, "[Plaintiff] interrupted to defiantly state that he was unfairly denied a promotion without explanation twice due to favoritism, and that managers only promoted their friends and those who participated in the 'cross-fit' exercise program." (Corey Eminger Decl. (Doc. 37) ¶ 20.) Collins stated that he does not recall Plaintiff referencing minorities, but rather, remembers Plaintiff saying,

---

[9] Plaintiff, too, submits evidence that he did not reference minorities — according to an email where his attorney relayed a phone call with Plaintiff's colleague Ashley Aggers, Aggers did not remember him explicitly mentioning race, (see Pl.'s Ex. 7, Emails and Text Messages (Doc. 39-7) at 2).

- 15 -

"they hire their favorites and cross fits." (Def.'s Ex. 10, Ted Collins Dep. Excerpts (Doc. 34-10) at 11–12.)

The parties also dispute how Plaintiff relayed his question or statement during the Data Dome incident. In his deposition, Plaintiff stated that "we was going in a circle asking questions from left to right," (Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 7), and that he wasn't "being unprofessional or anything," (id. at 18). Burns, in her affidavit, relayed the same, stating that "[Plaintiff] asked the question in a professional matter [sic]." (Pl.'s Ex. 2, Burns Aff. (Doc. 39-2) ¶ 4.) Defendant presents conflicting evidence as to how Plaintiff expressed himself. Eminger explained that Plaintiff "interrupted" Collins's presentation and made a "defiant[]" statement. (Corey Eminger Decl. (Doc. 37) ¶ 20.) Bouchard stated that it seemed like Defendant "was attempting to hijack what the Department was attempting to accomplish through the program." (Lisa Bouchard Decl. (Doc. 35) ¶ 16.) According to Collins, "[Plaintiff] presented [his question] as an outburst during the presentation." (Def.'s Ex. 10, Collins Dep. Excerpts (Doc. 34-10) at 11.)

After the incident, during the remainder of the final two-day presentation, Plaintiff was seen "slouching in his seat, looking at the ceiling, . . . focus[ing] on his phone," refusing

- 16 -

to join a small group activity, (Corey Eminger Decl. (Doc. 37) ¶ 21), and "roll[ing] his eyes," (Lisa Bouchard Decl. (Doc. 35) ¶ 17).

On November 8, 2021, three days after the meeting, Plaintiff was called into Eminger's office to discuss his behavior during the Data Dome two-day event. (Corey Eminger Decl. (Doc. 37) ¶ 27.) According to Eminger, "[Plaintiff] failed to take any accountability for making false statements, in a disruptive manner, and his overall behavior in the Data Dome closing session." (Id. ¶ 28.) Eminger conveyed details of the meeting to Collins and Human Resources. (Id. ¶ 31.)

On January 6, 2022,[10] Plaintiff was terminated. (Pl.'s Ex. 1, Aikens Termination Letter (Doc. 39-1); Def.'s Ex. 4, Termination Letter (Doc. 34-4).) The termination letter stated that Plaintiff "exhibited behavior which adversely affects or is otherwise detrimental to the interests of Herbalife Nutrition or employees as well as making false or defamatory statements that may damage the reputation and/or integrity of Herbalife Nutrition." (Pl.'s Ex. 1, Aikens Termination Letter, (Doc. 39-1)

---

[10] The termination letter offered by each party as an exhibit is dated "January 5, 2022," however the parties refer to Plaintiff's date of termination as "January 6, 2022" in their briefing. (See Def.'s Br. (Doc. 34) at 7; Pl.'s Resp. (Doc. 39) at 6.) Regardless, this one-day difference is immaterial to the issues before the court at summary judgment.

- 17 -

at 1.) Specifically, the termination letter describes Plaintiff's conduct at the two-day Data Dome final presentation, outlining three discrete "conduct issues": 1) his interruption of Collins's presentation on November 4th, 2021, when he stated that "management only promotes 'their favorites,' 'their friends,'" 2) Plaintiff's disengaged attitude and lack of participation in his small group activity on November 5th, 2021, and 3) his downplaying of the issue and admission that he "did not have evidence" of promotions based on favoritism in a subsequent meeting with Eminger on November 8, 2021. (Id. at 2–4.)

Plaintiff filed charges of discrimination with the Equal Employment Opportunity Commission("EEOC"), (Def.'s Ex. 13, EEOC Charge (Doc. 34-13) at 2), and the National Labor Relations Board ("NLRB"), (Pl.'s Ex. 3, NLRB Charge (Doc. 39-3) at 1).

In Plaintiff's Complaint, he alleges one claim for relief under 42 U.S.C. § 1981. (Compl. (Doc. 1) at ¶¶ 16–27.) He states that "[w]ith discriminatory intent, Defendant intentionally interfered with Plaintiff's federally protected right to make and enforce contracts in violation of 42 U.S.C. § 1981, specifically terminating his employment and preventing him from continuing his employment contract." (Id. ¶ 24.) Some of Plaintiff's allegations imply that he was wrongfully terminated

for engaging in a protected activity, (id. ¶ 12–13, 22), but other allegations imply that he was wrongfully terminated on the basis of his race, (see id. ¶ 14 ("Plaintiff's race was a factor when Defendant terminated his employment.")). Accordingly, this court will construe Plaintiff's Complaint to assert a claim of retaliation in violation of § 1981 and a claim of racial discrimination in violation of § 1981.

## II. **PROCEDURAL HISTORY**

Plaintiff filed his Complaint in the Western District of North Carolina on May 26, 2023. (Complaint ("Compl.") (Doc. 1).) Defendant filed a Motion to Change Venue on July 25, 2023. (Doc. 5.) The motion was granted, and the lawsuit was transferred to this court on September 1, 2023. (Doc. 12.) Defendant filed its Answer to Plaintiff's Complaint on September 15, 2023. (Answer (Doc. 15).)

On April 29, 2024, Defendant filed a Motion for Summary Judgment, (Def.'s Mot. for Summ. J. (Doc. 31)), along with two versions of a brief in support: a public version, (Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 32)), and, following a Motion to Seal, (Def.'s Mot to Seal (Doc. 33)), a version filed under temporary seal, (Sealed Br. in Supp. of Def.'s Mot. for Summ. J.

- 19 -

("Def.'s Br.") (Doc. 34).)[11] The same day, Defendant also filed three Declarations: one from Lisa Bouchard, (Lisa Bouchard Decl. (Doc. 35)), one from MaryAnn Atkins, (MaryAnn Atkins Decl. (Doc. 36)), and one from Corey Eminger, (Corey Eminger Decl. (Doc. 37)). Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment on June 4, 2024. (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 39)). Defendant replied on June 18, 2024. (Def.'s Reply in Further Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") (Doc. 42).)

On July 24, 2024, Defendant filed a Motion to Strike, (Def.'s Mot. to Strike (Doc. 43)), and a supporting memorandum, (Mem. of Law in Supp. of Def.'s Mot. to Strike ("Def.'s Mem.") (Doc. 44)). Plaintiff filed a Response in Opposition on August 14, 2024. (Pl.'s Resp. in Opp'n to Def.'s Mot. to Strike (Doc. 45).) Defendant replied on August 28, 2024. (Def.'s Reply (Doc. 46).)

## III. **ANALYSIS**

### A. **Defendant's Motion to Strike**

Before addressing the merits of Defendant's Motion for Summary Judgment, this court must address evidentiary objections raised in Defendant's Reply, (Def.'s Reply (Doc. 42)), and in

---

[11] This court cites to Defendant's sealed brief throughout this Memorandum Opinion and Order.

Defendant's subsequent Motion to Strike, (Def.'s Mot. to Strike (Doc. 43)), and corresponding memorandum, (Def.'s Mem. (Doc. 44)).[12] Defendant objects to Plaintiff's introduction of newly disclosed evidence in his Response in Opposition to Summary Judgment, (Pl.'s Resp. (Doc. 39)), and asks this court to strike the evidence from the record and disregard it for purposes of summary judgment. (Def.'s Mot. to Strike (Doc. 43) at 2.)[13]

### 1. <u>Newly Disclosed Evidence</u>

Defendant argues that Plaintiff, in his Response, "has presented multiple pieces of 'evidence' that he never disclosed to Defendant, despite multiple requests to do so." (Def.'s Reply (Doc. 42) at 4; <u>see</u> <u>also</u> Def.'s Mem. (Doc. 44) at 6.) First, Defendant argues that Plaintiff has improperly presented new messages with another Herbalife employee, Casey Wray ("Wray Messages"). (<u>See</u> Def.'s Reply (Doc. 42) at 4; Def.'s Mem. (Doc.

---

[12] Local Rule 7.6 permits a party to raise evidentiary objections in a reply brief. <u>See</u> LR 7.6 ("[A] party may assert evidentiary objections in its response or reply memorandum to factual allegations contained in memoranda or replies supporting or opposing . . . motions for summary judgment.").

[13] Plaintiff argues Defendant's Motion to Strike is untimely under the 21-day window provided by Federal Rule of Civil Procedure 12(f). (Pl.'s Resp. in Opp'n to Def.'s Mot. to Strike (Doc. 45) at 2.) Rule 12(f) governs motions to strike pleadings. Fed. R. Civ. P. 12(f). Defendant's Motion to Strike seeks to strike arguments and evidence presented at the summary judgment stage and thus, Rule 12(f) is inapplicable. <u>See</u> Fed. R. Civ. P. 7(a) (defining "pleadings").

Case 1:23-cv-00757-WO-JLW    Document 58    Filed 02/24/25    Page 21 of 57

44) at 6–7.) Second, Defendant argues that Plaintiff improperly presented new text messages between himself and Johnna Burns ("Burns Text Messages"). (See Def.'s Reply (Doc. 42) at 4; Def.'s Mem. (Doc. 44) at 7.) Third, Defendant argues that Plaintiff improperly presented a new email from Daisha Peele ("Daisha Peele Email"). (Def.'s Reply (Doc. 42) at 5; Def.'s Mem. (Doc. 44) at 7.)

Defendant's references to these newly disclosed pieces of evidence are replete with inaccurate citations to the record. Plaintiff has attached two text threads with Johnna Burns. One thread with Burns is found at Docket Entry 39-5. (Def.'s Ex. 5, Johnna Burns Text Messages (Doc. 39-5) at 1–2.) This thread is marked on ECF as "Exhibit C." Another thread with Burns is found at Docket Entry 39-7, pages three and four. (Def.'s Ex. 7, Emails and Text Messages (Doc. 39-7) at 3–4.) This thread is part of what is marked "Exhibit E" on ECF. Defendant cites to the Burns text messages as "ECF No. 39-5" in its Reply brief, (Def.'s Reply (Doc. 42) at 4), and later, in its Memorandum in Support of its Motion to Strike, as "Exhibit C (ECF No. 39-6)." (Def.'s Mem. (Doc. 44) at 7.) This court cannot ascertain which Burns text messages Defendant seeks to strike. Accordingly, this portion of Defendant's Motion to Strike is denied.

Defendant states in its Reply that the Daisha Peele Email is found at "ECF No. 39-6, p.5," (Def.'s Reply (Doc. 42) at 5), but states in its subsequent Memorandum in Support of its Motion to Strike that this email is found at "Exhibit E . . . (ECF No. 39-8)." (Def.'s Mem. (Doc. 44) at 7.) Neither Docket Entry 39-6 nor Docket Entry 39-8 contain an email from Daisha Peele. Plaintiff presents two different emails from Daisha Peele. (See Pl.'s Ex. 7, Emails and Text Messages (Doc. 39-7) at 1, 5.) However, because Defendant attached the Peele email found at Doc. 39-7, page one, to its Memorandum in Support of Summary Judgment, (Def.'s Ex. 17, Pl.'s Produc. (Doc. 34-17) at 2), and thus clearly received that email during discovery, this court construes Defendant's Motion to Strike to refer to the Peele email found at Doc. 39-7, page five.

Finally, the Wray Messages are found at Docket Entry 39-6, (Def.'s Ex. 6, Casey Wray Messages (Doc. 39-6).) These messages are marked as Exhibit D on ECF. Defendant, in its Memorandum in Support of its Motion to Strike, cites to the Wray Messages as "Exhibit D (ECF No. 39-7)." (Def.'s Mem. (Doc. 44) at 6.) There is only one set of messages with Wray, so despite this deficiency, it is clear to this court that Defendant seeks to strike Docket Entry 39-6. Accordingly, this court will analyze

whether the Wray messages and the Peele email found at Doc. 39-7, page five, should be stricken.

Defendant argues that, during discovery, it requested that Plaintiff produce all documents and information relating to his claims. (Def.'s Reply (Doc. 42) at 5.) Most importantly, Defendant requested "all documents and communications between you and any other person that relate to the facts and allegations upon which your Complaint is based between October 2015 and the present," (Def.'s Mem. (Doc. 44) at 3), "all documents evidencing communications between you and any current or former employee of Herbalife, including but not limited to personal notes, letters, memoranda, and emails, that pertain to your job performance, compensation, benefits, alleged harassment, separation from employment, or any other matter pertaining to your employment with Herbalife, " (id.), and "all documents relating to any complaints or reports of discrimination, harassment, or retaliation that you made to or about Defendant," (id.)

Defendant argues that these "newly-disclosed documents" are "plainly responsive to multiple [requests for production] served on Plaintiff by Defendant during the discovery period." (Id. at 6.) With respect to the Wray messages and the Peele email, this

- 24 -

court agrees.[14] But that is not the end of the inquiry. Federal Rule of Civil Procedure 37(c)(1) explains that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . , unless the failure was <u>substantially justified</u> or is <u>harmless</u>." Fed. R. Civ. P. 37(c)(1) (emphasis added); <u>see also</u> <u>Benjamin v. Sparks</u>, 986 F.3d 332, 341 (4th Cir. 2021).

This court retains "broad discretion" in determining whether such a failure was substantially justified or harmless, <u>Bresler v. Wilmington Tr. Co.</u>, 855 F.3d 178, 190 (4th Cir. 2017), but is instructed to consider the following:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial;(4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

<u>Id.</u> (quoting <u>S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.</u>, 318 F.3d 592, 597 (4th Cir. 2003)).[15] "The party failing to disclose information bears the burden of establishing that the

---

[14] Further, Plaintiff does not contest this point. (<u>See</u> <u>generally</u> Pl.'s Resp. in Opp'n to Def.'s Mot. to Strike (Doc. 45).)

[15] Although, district courts are "not <u>required</u> to tick through each of the <u>Southern States</u> factors." <u>Wilkins v. Montgomery</u>, 751 F.3d 214, 222 (4th Cir. 2014).

- 25 -

nondisclosure was substantially justified or was harmless."
Bresler, 855 F.3d at 190 (citation omitted).

Plaintiff does not dispute that he failed to produce the
Wray Messages and the Peele email, nor does he attempt to
provide any justification, let alone a "substantial
justification" for his failure. See Fed. R. Civ. P. 37(c)(1).
Rather, Plaintiff argues that his failure to produce the "text
messages" was "harmless." (Pl. Resp. in Opp'n to Def.'s Mot. to
Strike (Doc. 45) at 2.) Specifically, he argues that "the
substance of the text messages was disclosed during the
Plaintiff's employment as part of an allegation that he was
sexually harassing a female employee." (Id.)[16] Plaintiff does not
specify to which set of messages he refers,[17] but this court
construes Plaintiff's argument to refer to the messages with
Casey Wray, because in his Response in Opposition to Summary
Judgment, Plaintiff cites to the Wray messages as support for

---

[16] Plaintiff additionally argues that Defendant "waived
their right to object to the inclusion of the text messages"
because it did not raise the issue in its Reply. (Pl.'s Resp. in
Opp'n to Def.'s Mot. to Strike (Doc. 45) at 3.) This is false.
Defendant's Reply specifically notes that Plaintiff's Response
included evidence not previously disclosed in evidence,
including text messages with Casey Wray, text messages with
Johnna Burns, and an email from Daisha Peele. (Def.'s Reply
(Doc. 42) at 4-5.)
[17] As discussed above, Defendant's motion sought to strike
messages with two different people — messages with Burns and
messages with Wray.

the proposition that the investigation as to Plaintiff's sexual harassment "produced clear evidence that he was not the aggressor . . . and in fact, Wray had been pursuing him." (Pl.'s Resp. (Doc. 39) at 4.) Plaintiff provides no justification nor argument for his failure to provide the Peele email. In the absence of any argument that this failure was "substantially justified," or "harmless," Fed. R. Civ. P. 37(c)(1), Plaintiff will not be allowed to use the Peele email found at Doc. 39-7, page five, as evidence in its Response in Opposition to Defendant's Motion for Summary Judgment.

Plaintiff argues that the late addition of the Wray Messages was harmless because Defendant acquired these messages during its own investigation of the alleged sexual harassment. (See Pl.'s Resp. in Opp'n to Def.'s Mot. to Strike (Doc. 45) at 2-3.) "There is no general exception to the discovery rules for information that the requesting party already knows." Kariuki v. N. Carolina Dep't of Ins., No. 5:18-cv-341, 2021 WL 1601091, at *1 (E.D.N.C. Apr. 23, 2021). While the inclusion of evidence already known to an opposing party may be harmless, see Fazzie v. Steinberg, No. JKB-15-1730, 2018 WL 4335514, at *5 (D. Md. Sept. 11, 2018), Plaintiff has not provided any evidence that the content of these messages was previously known to Defendant. In support of his argument that the inclusion of the messages

was harmless, Plaintiff cites to excerpts of Collins's deposition, where Collins stated that HR investigated Plaintiff's alleged sexual misconduct. (See Pl.'s Ex. 1, Ted Collins Dep. Excerpts (Doc. 45-1).) Nowhere in the deposition excerpt does Collins address messages between Wray and Plaintiff, and in fact, Collins explained that the investigation and determination rested solely with HR and that he was not familiar with the investigation's findings. (Id. at 3.) Given Plaintiff's obligation to turn over information that was responsive to the RFPs, even if Defendant allegedly already held it, and Plaintiff's lack of proof that this failure was harmless, pursuant to Federal Rule 37(c)(1), Plaintiff will not be allowed to use the Wray Messages as evidence in opposition to Defendant's Motion for Summary Judgment.

### i. __Attorney's Fees__

Defendant also requests, pursuant to Rule 37(c)(1), "the reimbursement of its attorney's fees and expenses associated with preparing this motion to remedy the unfairness created by Plaintiff's misconduct." (Def.'s Mem. (Doc. 44) at 9.) Federal Rule of Civil Procedure 37(c)(1)(A) permits a court to "order payment of the reasonable expenses, including attorney's fees, caused by the failure [to provide information required by Rule 26(a) or (e)]." Fed. R. Civ. P. 37(c)(1)(A). This penalty may be

imposed "in addition to or instead of" Rule 37(c)(1)'s rule

prohibiting a party from using the information. Fed. R. Civ. P.

37(c)(1). However, as explained in <u>Southern States</u>, these

"alternative sanctions" referenced in Rule 37(c)(1) were

> primarily intended [by the advisory committee] to
> apply when a party fails to disclose evidence helpful
> to an <u>opposing</u> party. . . . This is because
> "[p]reclusion of evidence is not an effective
> incentive to compel information that, being
> supportive of the position of the opposing party,
> might advantageously be concealed by the disclosing
> party."

<u>S. States Rack & Fixture, Inc.</u>, 318 F.3d at 595 n.2; <u>see also</u>

<u>Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan</u>

<u>Sports Enters., Inc.</u>, 694 F. Supp. 3d 625, 656 (M.D.N.C. 2023).

Neither the Wray Messages nor the Peele email are helpful

to Defendant. Accordingly, this court finds the exclusion of the

evidence a sufficient remedy and denies Defendant's request for

attorney's fees.

### B. **Defendant's Motion for Summary Judgment**

#### 1. **Standard of Review**

Summary judgment is appropriate when "there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986). This court's

summary judgment inquiry is whether the evidence "is so one-

sided that one party must prevail as a matter of law." <u>Anderson</u>,

- 29 -

477 U.S. at 252. The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." McLean, 332 F.3d at 719 (citing Anderson, 477 U.S. at 247-48).

## 2. **Retaliation Claim**[18]

42 U.S.C. § 1981 provides that "[a]ll persons within the . . . United States shall have the same right in every State and

---

[18] Defendant, in its Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, argues that Plaintiff's claim for retaliation has been conceded because Plaintiff failed to address it in his Response to Defendant's Motion for Summary Judgment. (See Def.'s Reply (Doc. 42) at 5.) Plaintiff's Response conflates the elements of his two distinct claims, so although it does not mention the word "retaliation," there are pieces of his argument that appear to address the elements of retaliation. Given the presence of what appears to be some argument in support of a retaliation claim and because the Fourth Circuit has a "strong policy that cases be decided on the merits." United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993), this court does not find Plaintiff's retaliation claim conceded.

- 30 -

Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 "encompasses claims of retaliation." CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008).

When employment discrimination plaintiffs lack direct evidence of retaliatory discrimination, they may proceed by satisfying the "McDonnell Douglas framework[, which] is a three-step burden-shifting framework." Foster v. Univ. of Md.-Eastern Shore, 787 F.3d 243, 250 (4th Cir. 2015). Plaintiff does not put forth any direct evidence of discrimination, so this court will proceed via the McDonnell Douglas framework. This framework first requires the plaintiff to establish a prima facie case. Id. "To establish a prima facie case of retaliation under Title VII, [a plaintiff] must show (i) that [he] engaged in a protected activity, (ii) that [his employer] took adverse action against [him], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." Guessous v. Fairview Prop. Invests., LLC, 828 F.3d

208, 217 (4th Cir. 2016) (internal quotation marks and citation omitted).[19]

If the plaintiff has established a prima facie case of retaliation,

> [t]he burden then shifts to the [defendant] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination.

Foster, 787 F.3d at 250 (internal quotation marks and citations omitted).

### i. **Prima Facie Case of Retaliation**

The first element of the prima facie case requires a plaintiff to establish that he engaged in a protected activity. Guessous, 828 F.3d at 217. "In CBOCS, . . . the Court held that 42 U.S.C. § 1981 — which declares that all persons 'shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens' — prohibits not only racial discrimination but also retaliation against those who oppose it." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 354–55

---

[19] "A prima facie retaliation claim under § 1981 has the same elements as a retaliation claim under Title VII." Parks v. La.-Pac. Corp., 400 F. Supp. 3d 393, 416 (W.D.N.C. 2019); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc).

(2013) (citing CBOCS West, Inc., 553 U.S. at 445). "An employee opposes race discrimination [in employment] when [he] 'communicates to [his] employer a belief that the employer has engaged in' such discrimination.'" Ali v. BC Architects Eng'rs, PLC, 832 Fed. App'x 167, 172 (4th Cir. 2020) (quoting Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276 (2009)).

"[F]or an employee's activity to constitute protected 'opposition,' [he] must show (1) that [he] reasonably believed that the employment action [he] opposed constituted a [§ 1981] violation, and (2) that [his] conduct in opposition was reasonable." Netter v. Barnes, 908 F.3d 932, 937-38 (4th Cir. 2018);[20] see also Ali, 832 Fed. App'x at 172.

Plaintiff, in his Complaint, appears to allege that the following activity was protected: "At a training meeting on November 4, 2021, Plaintiff . . . specifically questioned

_____

[20] In Netter, the Fourth Circuit analyzed claims of retaliation under Title VII and § 1981 under the same standard, explaining that, "[b]ecause § 1981 'affords no greater substantive protection than Title VII' in the circumstances here, our analysis of [the plaintiff's] claim 'also disposes of the § 1981 claim.'" Netter, 908 F.3d at 937, n.1 (citation omitted); see also N.Y.C. Transit Auth. v. Beazer, 440 U.S. 568, 583 n.24 (1979) ("[I]t seems clear that [§ 1981] affords no greater substantive protection than Title VII."). Accordingly, this court applies both § 1981 caselaw and Title VII caselaw in evaluating whether Plaintiff has put forth evidence for a reasonable jury to find that he engaged in a protected activity.

whether minorities were being passed over for promotions because of their race . . . ." (Compl. (Doc. 1) ¶ 9.) Defendant, at summary judgment, argues the evidence does not show that Plaintiff made such a statement. (Def.'s Br. (Doc. 34) at 18 ("[T]here are serious issues with Plaintiff's 'evidence' of having even engaged in protected activity at all.").) But even if he did, Defendant argues Plaintiff's question "does not qualify as protected activity" because his conduct was "disrespectful, unprofessional, counter to [Herbalife's] training and disruptive." (Def.'s Br. (Doc. 34) at 21-22 (quoting Def.'s Ex. 4, Termination Letter (Doc. 34-4) at 5).)

The parties dispute whether Plaintiff actually "'communicate[d] to [Defendant] a belief that [Defendant] has engaged in' [racial] discrimination" in violation of § 1981, see Ali, 832 Fed. App'x at 172, and further, whether his conduct in opposition was "reasonable," Netter, 908 F.3d at 937-38, or whether it was "disruptive or disorderly," Laughlin, 149 F.3d at 260, and therefore not protected opposition activity. However, even assuming Plaintiff addressed racial discrimination in the promotion process and did so without being "disruptive or disorderly," id., Plaintiff still fails to establish that he was engaged in a protected activity, because he has not shown that

- 34 -

he "reasonably believed that the employment action [he] opposed constituted a [§ 1981] violation." <u>Netter</u>, 908 F.3d at 937-38.[21]

For a plaintiff to show that he "reasonably believed the employment action [he] opposed constituted a [§ 1981] violation," <u>id.</u>, he must "point to specific evidence in the record from which a jury could infer that a reasonable person in the plaintiff's shoes would have 'belie[ved] that [his] complaints related to an ongoing [§ 1981] violation." <u>Cosby v. S. Carolina Prob., Parole & Pardon Servs.</u>, 93 F.4th 707, 719 (4th Cir. 2024) (analyzing a Title VII retaliation claim); <u>see also</u> <u>Boyer-Liberto v. Fontainebleau Corp.</u>, 786 F.3d 264, 285 (4th Cir. 2015) (en banc) (analyzing whether plaintiff's belief was objectively reasonable for retaliation claims under Title VII and § 1981). In other words, "[t]o warrant protection, the employee's perception of a violation must be 'objectively reasonable' under the circumstances known to [him]." <u>Strothers v. City of Laurel, Md.</u>, 895 F.3d 317, 328 (4th Cir. 2018).

Accordingly, this court must determine "whether the circumstances known to [Plaintiff] at the time of [his]

---

[21] "Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue may be resolved as a matter of law." <u>Session v. Montgomery Cnty. Sch. Bd.</u>, 462 Fed. App'x 323, 325 (4th Cir. 2012) (quoting <u>Jordan v. Alternative Res. Corp.</u>, 458 F.3d 332, 339 (4th Cir. 2006)).

complaint support a reasonable belief" that Defendant Herbalife

was engaging in racially discriminatory promotional practices.

See id.; see also Boyer-Liberto, 786 F.3d at 285; Cosby, 93

F.4th at 719.

In determining whether a plaintiff had a "reasonable basis"

to oppose unlawful discrimination, the Fourth Circuit in

Strothers looked to the elements of the alleged unlawful

practice (in that case, hostile work environment), "in light of

what [the plaintiff] knew." Strothers, 895 F.3d at 328; see also

Doyle v. Advanced Fraud Sols., LLC, No. 1:18-cv-885, 2020 WL

1305162, at *7 (M.D.N.C. Mar. 19, 2020) ("In determining what

constitutes objective reasonableness, this court will start by

examining the case law pertaining to the complained-of

conduct.") (12(b)(6) context). Plaintiff asserted in his

deposition that, at the Data Dome meeting, he asked "how come

minorities don't get the same opportunity to move up as

Caucasians." (See Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9)

at 7; see also Compl. (Doc. 1) ¶ 9.)

"To establish a prima facie case of failure to promote

based on race, a plaintiff must show that: '(1) [he] is a member

of a protected group, (2) there was a specific position for

which [he] applied, (3) [he] was qualified for that position,

and (4) [the defendant] rejected [his] application under

- 36 -

circumstances that give rise to an inference of discrimination.'" Benson v. Vaughn Industs. LLC, 450 F. Supp. 3d 655, 665 (E.D.N.C. 2020) (quoting Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004)). These elements need not be actually satisfied, but the evidence must show that at the time of the complaint, Plaintiff's "belief that these elements were satisfied was reasonable." Strothers, 895 F.3d at 328.

Plaintiff fails to point to any evidence in the record that would permit a jury to find that when he made his complaint at the Data Dome meeting, he had a reasonable belief that the elements of failure-to-promote in violation of § 1981 were satisfied — neither with respect to himself nor with respect to

any other employees.[22] Nor does any evidence in the record

support such a finding. In his deposition, Plaintiff stated:

"I've seen they have chosen the white employee over the black."

(Def.'s Ex. A, Aikens Dep. Excerpts (Doc. 42-1) at 3.) He

provided the following examples:

> [T]he only time I knew that there was direct
> competition was between Darryl when he was trying to
> become the quality control supervisor and a Caucasian

---

[22] Plaintiff, in his Response, states that he "noticed that although there seemed to be an equal number of white and minority employees, only two out of 10 minority employees had been promoted during the time Plaintiff had been at Herbalife while eight or nine white employees had been promoted." (Pl.'s Resp. (Doc. 39) at 5.) This assertion is not accompanied by any citation to the record. Defendant has submitted Plaintiff's interrogatory responses, which includes a chart of minority and non-minority employees and their "Date of Promotion or Application." (See Def.'s Ex. 15, Pl.'s Discovery Resps. (Doc. 34-15) at 7.) Notably, Plaintiff did not submit this, nor cite to the chart in his Response. Further, this chart's probative value is suspect at best — under the column listed "Date of Promotion or Application" the chart lists "Unknown" for eight of the ten employees. This court cannot ascertain if those employees applied for a promotion and were denied or never applied for a promotion. Further, despite Plaintiff's allegation that eight White employees were promoted compared to only two minority employees, this chart only lists five White employees. Nor has Plaintiff put forth any evidence of the ratio of Black and White employees at Herbalife. At bottom, this chart is vague and incomplete in light of Plaintiff's allegations and is not sufficient to support a reasonable belief of racial discrimination in promotions. It is also contradicted by a sworn statement from Herbalife's HR Manager, MaryAnn Atkins, who noted that "HR records confirm that during [Plaintiff's] time in the QC Department, a higher percentage of Black or African American employees had been promoted than White Employees: 79% of White employees and 87% of Black or African American employees in the Quality Control department received at least on promotion in that time." (MaryAnn Atkins Decl. (Doc. 36) ¶ 20.)

man on second shift, I do know the Caucasian man got
the title. And Margo . . . applied to be a manger,
the qualify [sic] control manager, and they made
Corey the manager because Corey was originally the
quality control, I mean, the microbiologist
supervisor. And they both applied for the position
and he got the title. . . . Me personally, they chose
Tiffaney over me. As far as Juan and Joey, they just
got title changes. . . . [I]t wasn't a competition
between them.

(Id.) As an initial matter, it is not clear from the deposition

which of these individuals are members of a protected class.

However, because this court must construe all facts in the light

most favorable to Plaintiff, this court understands Plaintiff to

assert that Darryl and Margo are members of a protected class.

However, with respect to Darryl, the unnamed "Caucasian man on

second shift," Margo, and Corey, Plaintiff admitted he did not

know their prior work experience, the details of their

performance reviews, or their relative qualifications. (Id. at

5-6.)

Q: Yeah. So you don't know where the other employees
were working prior to Herbalife?

[Plaintiff]: Huh-uh.

Q: Or what duties they might have performed?

[Plaintiff]: Before Herbalife? No.

Q: And you wouldn't have been involved in any
performance reviews for those other employees?

[Plaintiff]: No.

Q: Are you taking the position that any of these employees that were promoted did not deserve the promotion?

[Plaintiff]: No. It was an observation that both – both employees were qualified, but they chose the Caucasian employees more times and both were good. And not saying one is more qualified than the other, but they both seem both pretty well suited in the career. And they coincidentally happen to seem to favor a particular race over another race which led to reviews and me speaking on behalf of them in the Data Dome.

Q: Yeah. So, but you don't know whether one was qualified over the other?

[Plaintiff]: No.

Q: And you don't know for any of these instances of promotion whether the individual promoted was the most qualified for that promotion?

[Plaintiff]: No.

(Id.)

No reasonable jury could find that Plaintiff reasonably believed that the elements of discriminatory promotion were satisfied here. The elements of failure-to-promote require a showing that the person who did not receive the promotion was "qualified for the position sought." Williams v. Henderson, 129 Fed. App'x 806, 813 (4th Cir. 2005). Although Plaintiff stated that "both employees were qualified," (Def.'s Ex. A, Aikens Dep. Excerpts (Doc. 42-1) at 5-6), he conceded he did not know details regarding the qualifications of any of the relevant applicants. Further, Plaintiff has provided no indication that

- 40 -

he reasonably believed these individuals were rejected for promotion "under circumstances that give rise rise to an inference of discrimination," <u>Benson</u>, 450 F. Supp. 3d at 665 (E.D.N.C. 2020).[23]

Plaintiff has similarly failed to show that he reasonably believed the elements of failure-to-promote in violation of § 1981 were satisfied with respect to his own alleged experience of racial discrimination when he applied for a position as a "Chem 1," and "[Herbalife] chose Tiffaney over me," (Def.'s Ex. A, Aikens Dep. Excerpts (Doc. 42-1) at 3, 5). Plaintiff asserted in his deposition that "the qualifications for chem 1 was a Bachelor's degree with zero to one year experience or a person with Associate's degree with at least 5 years of experience. That was a prerequisite and, you know, I was 2 years above it." (<u>Id.</u> at 5.) Assuming Plaintiff fulfilled the position's baseline

_____

[23] This court notes that Plaintiff also submits a screenshot of an email from Daisha Peele, in which she recounts her own experience of being overlooked for promotions. (<u>See</u> Pl.'s Ex. 7, Emails and Text Messages (Doc. 39-7) at 1.) But without any evidence that Plaintiff was aware of her experience <u>at the time he made the statement</u> at Data Dome, Peele's email is irrelevant to whether Plaintiff's belief at that time was objectively reasonable. Plaintiff has not provided any evidence that he was aware of Peele's experience at the relevant time. In fact, the record suggests he was not — in his deposition he gave three discrete examples of instances of alleged discrimination in promotions and did not mention Peele. (<u>See</u> Def.'s Ex. A, Aikens Dep. Excerpts (Doc. 42-1) at 3.)

qualifications as he avers, Plaintiff has again not shown that
he reasonably believed he was rejected for the position "under
circumstances that give rise to an inference of discrimination."
Benson, 450 F. Supp. 3d at 665.

As an initial matter, Plaintiff did not know any details
regarding Tiffaney's qualifications. In his deposition,
Plaintiff said he knew "she had a science degree, but she had
less chemistry or lab experience than [Plaintiff]." (Def.'s Ex.
A, Aikens Dep. Excerpts (Doc. 42-1) at 4).[24] Plaintiff conceded
he did not know any other details about her qualifications:

> Q: An animal science degree from where?
>
> [Plaintiff]: I'm not sure.
>
> Q: And she worked in a lab where?
>
> [Plaintiff]: I'm not sure. I didn't ask her job. She
> just said she had two years of experience.
>
> Q: What was she doing in her other job?
>
> [Plaintiff]: I really don't know.
>
> Q: Have you seen any of her reviews?

---

[24] It is concerning to this court that Plaintiff
misconstrues the facts in his Response in Opposition to Summary
Judgment. In his deposition, Plaintiff stated that the White
woman who received the "Chem I" position he applied for "had
about two years of lab experience." (Def.'s Ex. A, Aikens Dep.
Excerpts (Doc. 42-1) at 4.) In his Response, he states (without
any citations to the record) that "Herbalife would go on to hire
[(for the Chem I position)] a Caucasian female with no
experience." (Pl.'s Resp. (Doc. 39) at 4.)

[Plaintiff]: No.

(Id.) In other words, Plaintiff did not know whether he and she were similarly qualified for the role.

Further, and more importantly, the record shows that around the time he applied for this position, he had been the subject of a plethora of complaints. In one-on-one coaching in May of 2020, his supervisor explicitly told him that "if he wants to be considered for a promotion . . . he will have to meet/exceed and maintain the expectations out lined above along with his usual job duties for an extended length of time(many months)." (Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8) at 11.) Although Plaintiff stated in his deposition that he did meet his supervisor's expectations, (see Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 13), the record belies this statement — following the May 2020 one-one-one meeting, Plaintiff was reprimanded for 1) having errors in his write ups, (Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8) at 12), 2) writing unprofessional comments in his work book, (id.), 3) watching cartoons in the lab, (id. at 15), and 4) having sloppy and illegible handwriting, (id. at 16).

After an explicit warning that he would not be considered for a promotion unless he was able to "meet [or] exceed" expectations for an extended period of time, (id. at 11),

- 43 -

Plaintiff was reprimanded several times for engaging in the same conduct he was warned would hinder his ability to receive a promotion. During this time, he applied for a promotion and was denied. It was not objectively reasonable for Plaintiff, given his prior communications with his supervisor and his continued errors and misconduct, to assume that his denial of a promotion was an unlawful form of racial discrimination.[25]

Because Plaintiff has failed to demonstrate that he reasonably believed Herbalife had violated § 1981, even assuming he questioned racial discrimination at the Data Dome meeting, this was not protected activity. Accordingly, because Plaintiff is required to show that he was engaged in a protected activity for purposes of the prima facie case, his retaliation claim fails as a matter of law. When the prima facie case is not established, the question of pretext is not relevant. See Haywood v. Locke, 387 Fed. App'x 355, 357 (4th Cir. 2010).

---

[25] Even further, Plaintiff stated in his deposition that Eminger told him he did not get the promotion because of his handwriting. (Def.'s Ex. 9, Aikens Dep. Excerpts (Doc. 34-9) at 6.) Plaintiff also stated that Martin told him it was because the other candidate was "better, qualified." (Id. at 12-13.) Given the history of complaints regarding Plaintiff and his work product, including repeated complaints about the legibility of his handwriting, these reasons do not justify a reasonable inference of racial discrimination.

- 44 -

Defendant's Motion for Summary Judgment is granted as to
Plaintiff's retaliation claim.

### 3. <u>42 U.S.C. § 1981 Racial Discrimination Claim</u>

A plaintiff employee pursuing a claim of racial
discrimination in violation of § 1981 may prove discrimination
in one of two ways. First, they may put forth direct evidence of
racial discrimination, such as "conduct or statements that . . .
reflect . . . the alleged discriminatory attitude and that bear
directly on the contested employment decision." <u>Fuller v.
Phipps</u>, 67 F.3d 1137, 1142 (4th Cir. 1995) (abrogated on other
grounds). If a plaintiff is unable to put forth direct evidence
of discrimination, then the <u>McDonnell Douglas</u> burden-shifting
scheme will apply. <u>See Patterson v. McLean Credit Un.</u>, 491 U.S.
164, 186 (1989) (explaining that <u>McDonnell Douglas</u> scheme
applies to § 1981 claims). "Most discrimination cases . . . will
fall within this traditional <u>McDonnell Douglas</u> . . . framework."
<u>Fuller</u>, 67 F.3d at 1141.

Plaintiff has not put forth direct evidence of
discrimination based on race. In his deposition, he testified
that his claim that race was a factor in his termination was
based solely on "compare and contrast" to non-minority
individuals who were not terminated. (<u>See</u> Def.'s Ex. 9, Aikens
Dep. Excerpts (Doc. 34-9) at 23.) Therefore, the burden-

- 45 -

shifting evidentiary framework established by <u>McDonnell Douglas</u>
<u>Corp. v. Green</u>, 411 U.S. 792 (1973), applies to his claim for
relief. "[T]he plaintiff employee 'must first establish a prima
facie case of employment discrimination.'" <u>Irani v. Palmetto</u>
<u>Health</u>, 767 Fed. App'x 399, 418 (4th Cir. 2019) (quoting
<u>Guessous</u>, 828 F.3d at 216). If the plaintiff is able to make
this showing, "the burden of production 'shifts to the employer
to articulate a non-discriminatory . . . reason for the adverse
action.'" <u>Id.</u> Then, the burden shifts back to the plaintiff
employee, who must show "by a preponderance of the evidence that
the stated reason for the adverse employment action is a pretext
and that the true reason is discriminatory." <u>Id.</u>

In order to establish a prima facie case of discriminatory
termination,

> a plaintiff must make a prima facie showing that: (1)
> he was a member of a protected class; (2) he was
> satisfactorily performing his job at the time of the
> termination; (3) he was terminated from his
> employment; and (4) the prohibited conduct in which
> he engaged was comparable in seriousness to
> misconduct of other employees outside the protected
> class who received less severe discipline.

<u>Haynes v. Waste Connections, Inc.</u>, 922 F.3d 219, 223 (4th Cir.
2019).

It is undisputed that Plaintiff is a member of a protected
class and that he was subject to an adverse employment action.
Therefore, the elements of the prima facie case that are in

- 46 -

dispute are i) whether he was treated differently from similarly situated employees outside of his protected class (Prong Four) and ii) whether he was satisfactorily performing his job at the time of the adverse employment action (Prong Two).

### i. <u>Similarly Situated Employees</u>

This prong of the prima facie case requires the identification of an appropriate comparator. <u>See</u> <u>Haynes</u>, 922 F.3d at 223. "[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and the comparator 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" <u>Id.</u> at 223-24 (quoting <u>Haywood</u>, 387 Fed. App'x at 359). Although, notably, "plaintiffs do not need to share the same supervisor in every case, and that comparison point is not a bar to relief in a case . . . where the comparators are otherwise similar in all relevant respects." <u>Cowgill v. First Data Techs., Inc.</u>, 41 F.4th 370, 382 (4th Cir. 2022) (internal quotation marks and citation omitted).

Plaintiff, in his Response in Opposition to Summary Judgment, identifies two comparators, both White: Scott Dixon and Casey Wray. (Pl.'s Resp. (Doc. 39) at 6-7.) He alleges that

- 47 -

these two individuals, outside of his protected class, "were treated differently than he was." (Id. at 6.) Specifically, he argues that Scott Dixon "was not terminated for behavior that was demonstrably worse in the exact same meetings with the same consulting group" and that "Wray, a Caucasian female was not terminated for her sexually explicit messages but later would receive a promotion." (Id. at 4, 6.)

As an initial matter, Plaintiff provides no admissible evidence regarding his second comparator, Casey Wray. (See supra Section III.A.1. (striking the Wray Messages).) Further, there is nothing in the record to suggest that she had the same supervisor as Plaintiff or that she is otherwise similar in all relevant respects. Accordingly, the record does not support a finding that Wray is similarly situated to Plaintiff.

As to Plaintiff's first comparator, Scott Dixon, the record shows the following. Collins, when asked in his deposition, if he "recall[ed] any incidents where [Dixon] was disrespectful or disruptive towards DataDome," he answered, "[Dixon] had performance issues, yes. He did have difficulties with DataDome." (Pl.'s Ex. 4, Collins Dep. (Doc. 39-4) at 73.) Additionally, he stated that Dixon had a "regular pattern of drawing conclusions that were not supported by fact," and "not working as a team member." (Id.) According to a text message

- 48 -

from Johnna Burns, Dixon had "several write ups," and had a "heated" interaction with a Data Dome employee. (Pl.'s Ex. 5, Johnna Burns Text Messages (Doc. 39-5) at 1.) Additionally, in a text message to "Tiffaney," Plaintiff stated: "Remember that Tuesday meeting we had when [Dixon] called Lisa [(Bouchard)] a bitch to Ted [and] Corey and said she was talking rudely," to which Tiffaney responded with an emoji of a laughing face. (Pl.'s Ex. 7, Emails and Text Messages (Doc. 39-7) at 3.)[26] Dixon was not fired, although the record suggests that he was disciplined for some of his misconduct. (See id.)

Plaintiff fails to "establish [Dixon as] a valid comparator." See Haynes, 922 F.3d at 223. First, there is no evidence that Plaintiff and Dixon reported to the same supervisor.[27] And although "that comparison point is not a bar to relief in a case . . . where the comparators are otherwise similar in 'all relevant respects,'" Cowgill, 41 F.4th at 382, Plaintiff has not established that the two are otherwise similar in all relevant respects. Plaintiff and Dixon held different

---

[26] Collins stated in his deposition that he "[did] not recall a situation where [Dixon] used profanity toward the consultant." (Pl.'s Ex. 4, Ted Collins Dep. (Doc. 39-4) at 73.)

[27] Plaintiff argues in his Response in Opposition to Summary Judgment that he and Dixon "report[ed] to the same supervisor." (Pl.'s Resp. (Doc. 39) at 8.) But this argument is not accompanied by a citation to the record, nor does any part of the record support it.

positions at Herbalife: Plaintiff was employed as a Lab Tech, while Dixon was employed as Chemist I and later Chemist II. (See Def.'s Ex. 3, Position Transfer Letter (Doc. 34-3) at 2; Def.'s Ex. 15, Pl.'s Discovery Resps. (Doc. 34-15) at 7.) Additionally, throughout the year prior to his termination, Plaintiff was the subject of a plethora of complaints regarding errors in his work, problems with the legibility of his work product, his work ethic, his watching videos in the lab, and making inappropriate and rude comments to co-workers. (See generally Def.'s Ex. 8, Herbalife Internal Emails (Doc. 34-8); Def.'s Ex. A, Internal Emails (Doc. 36-1); Def.'s Ex. B, Internal Emails (Doc. 36-2).) But Plaintiff has only provided vague assertions of Dixon's misconduct beyond his undisputed Data Dome performance issues. Specifically, all Plaintiff puts forth is that Dixon had "write-ups," and called the Data Dome consultant, Lisa Bouchard, a "bitch." Based on the evidence presented, this court cannot find that Dixon was sufficiently "similar in all relevant respects" to Plaintiff.

In Hoyle v. Freightliner, LLC, the plaintiff, after having "significant problems with absenteeism," leading to a "last chance agreement" with her employer, was terminated for calling in sick. 650 F.3d 321, 327–28, 337 (4th Cir. 2011). In that case, the Fourth Circuit held that that the plaintiff had failed

to identify a valid comparator because "[w]hile [plaintiff] identified similarly situated male employees who called in sick at the time [she] did and were not disciplined, [plaintiff] failed to identify any similarly situated men who also had problems with excessive absenteeism, leading to a 'last chance' agreement." Id. at 337. Similarly, here, although Plaintiff has identified an individual (Dixon) who also had difficulties with Data Dome, he has "failed to identify any similarly situated [non-Black] employees who also had [a comparable history of complaints regarding work product and behavior.]" Id.[28]

Further, the record shows that "differentiating or mitigating circumstances" existed that "distinguish[e]d their conduct [and] their employer's treatment of them for it." See Haynes, 922 F.3d at 224. In response to the question "[w]hy was [Dixon] not terminated for his difficulties with DataDome?" Collins explained that unlike Plaintiff, Dixon's difficulties "were largely early on discussions. So not at the conclusion of the campaign, not after we've learned our tools and applied

---

[28] Accordingly, Plaintiff's citation to Haynes v. Waste Connections, Inc., is unavailing. (See Pl.'s Resp. (Doc. 39) at 7-8.) In that case, the comparator had "more infractions and was less respectful to his superiors, . . . yet received more favorable treatment," than the plaintiff. 922 F.3d 219, 224 (4th Cir. 2019).

them, but early on at the start."[29] (Pl.'s Ex. 4, Ted Collins Dep. (Doc. 39-4) at 73.)

But even assuming Plaintiff could show that Dixon is a valid comparator, he still fails to establish a prima facie case because he has not demonstrated prong two: satisfactory job performance.

### ii.  **Job Performance**

Under McDonnell-Douglas, a Plaintiff must "demonstrate that he 'was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse action.'" Giles v. Nat'l R.R. Passenger Corp., 59 F.4th 696, 704 (4th Cir. 2023) (citation omitted). Notably, a plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [he] was meeting [his employer's] expectations," King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003), because "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff," Giles, 59 F.4th at 704 (internal quotation marks and citation omitted).

_____

[29] Collins additionally explained that "[Dixon] brought forth his concerns as questions and did not have the outburst like [Plaintiff] did." (Pl.'s Ex. 4, Ted Collins Dep. (Doc. 39-4) at 73.) But this basis for differential treatment concerns a disputed question of fact — whether Plaintiff indeed presented his statement or question as an "outburst." (See supra Section III.B.2.i.)

Plaintiff has not demonstrated that he was meeting Herbalife's expectations at the time of the adverse action. He has not provided any evidence, beyond his own assertions, that he was a successful employee.[30] Yet, Herbalife has provided extensive evidence that Plaintiff had persistent performance and behavioral issues in the two years leading up to his termination, (see supra Section I), and at the Data Dome meeting.[31] See Purchase v. Astrue, 324 Fed. App'x 239, 241–42 (4th Cir. 2009) ("[Plaintiff] fails to demonstrate that she was performing her job at a satisfactory level. The record is replete with documentation of her performance shortcomings.")

---

[30] Plaintiff's brief does not address the adequacy of his job performance beyond stating that "as the record reflects every allegation of inappropriate behavior by the Plaintiff was investigated and they were all unfounded." (Pl.'s Resp. (Doc. 39) at 11.) This appears to be in reference to the allegation that Plaintiff inappropriately gestured to his genitals, for which Defendant ultimately did not pursue disciplinary actions. But Defendant has outlined a series of performance and behavioral issues, unrelated to that allegations which are undisputed by Plaintiff and supported by the record. (See supra Section I.)

[31] Although portions of Plaintiff's alleged misconduct at the Data Dome meeting are in dispute, Plaintiff has not disputed that during the Data Dome final two-day presentation, he was "not participating . . . with his group," "rolled his eyes," and was "using his cell phone," which was part of the umbrella of behavior that Defendant explained in Plaintiff's Termination Letter was "opposed to . . . established Company policy, Company values and the departmental Team operating Agreement." (Pl.'s Ex. 1, Termination Letter (Doc. 39-1) at 1–3.)

- 53 -

When a plaintiff fails to demonstrate he performed his job satisfactorily, "he cannot state a prima facie case of disparate treatment [and] the presumption that his termination was based on discrimination cannot apply, and summary judgment . . . is appropriate." Parks v. La.-Pac. Corp., 400 F. Supp. 3d 393, 414 (W.D.N.C. 2019). Without any evidence that Plaintiff was performing his job satisfactorily, he fails to establish a necessary prong of the prima facie case of race discrimination under § 1981.

Although Plaintiff argued the question of pretext throughout his opposition brief, when the prima facie case has not been met, the question of pretext is not relevant. See Haywood, 387 Fed. App'x at 357.

In sum, because Plaintiff has failed to establish prong two and prong four of the McDonnell Douglas framework, he has not established a prima facie case of race discrimination, and thus summary judgment as to this claim is appropriate.

### C.   Defendant's Motion to Seal

Defendant filed a Motion to Seal its Brief in Support of Summary Judgment. (Mot. to Seal (Doc. 33).) This motion seeks only to seal Exhibit 16 of its Brief, which "contains health records that Plaintiff Cameron J. Aikens has indicated he considers to be confidential material." (Id. at 1.) Defendant

- 54 -

states that "pursuant to Rule 5.4 and the parties' Local Civil Rule 5.5 Joint Report (ECF No. 17), Plaintiff will have 14 days from the filing of this Motion to file a response providing the materials and information required by LR 5.4(c)(3)." (Id.) Plaintiff has not filed any response relating to this Motion to Seal.

Local Rule 5.4 states:

No motion to seal will be granted without a sufficient showing by the party claiming confidentiality as to why sealing is necessary and why less drastic alternatives will not afford adequate protection, with evidentiary support, including affidavits or declarations, and with citation to any supporting statutes, case law, or other authority. If confidential information needs to be discussed or provided to make this showing, a sealed supplement to the motion to seal may be filed separately. This showing also must address the length of time for which sealing is sought. Failure to file LR 5.4(c)(3) supporting materials will result in denial of the motion to seal and unsealing of the materials without further notice.

LR 5.4(c)(3). Plaintiff, as the party seeking confidentiality of Exhibit 16, has failed to comply with Local Rule 5.4. Accordingly, this Motion to Seal will be denied without prejudice to Plaintiff filing materials supporting the sealing of this document consistent with Local Rule 5.4.

IV. __CONCLUSION__

This court grants Defendant's Motion to Strike as to the
Wray Messages, (Doc. 39-6), and the Peele Email, (Doc. 39-7 at
5), because this evidence was responsive to RFPs, but not
disclosed during discovery, and Plaintiff's failure to disclose
them was neither substantially justified nor harmless.
Accordingly, Plaintiff may not use them in support of his
Response in Opposition to Defendant's Motion for Summary Judgment
pursuant to Federal Rule of Civil Procedure 37(c)(1).

This court grants Defendant's Motion for Summary Judgment as
to Plaintiff's claims for retaliation and racial discrimination
in violation of § 1981, because Plaintiff has failed to establish
a prima facie case for either claim.

This court denies without prejudice Defendant's Motion to
Seal, because Plaintiff, as the party seeking confidentiality,
failed to comply with Local Rule 5.4.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that
Defendant's Motion for Summary Judgment, (Doc. 31), is **GRANTED**
and this case is **DISMISSED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Seal, (Doc.
33), is **DENIED WITHOUT PREJUDICE.** The document, (Doc. 34-16),
shall remain sealed for 20 days to allow Plaintiff to file

- 56 -

materials supporting the sealing of this document consistent with Local Rule 5.4.

      **IT IS FURTHER ORDERED** that Defendant's Motion to Strike, (Doc. 43), is **GRANTED** as to the Wray Messages and the Peele Email and **DENIED** as to the Burns messages.

      **IT IS FURTHER ORDERED** that the Final Pretrial Conference set for February 27, 2025, is **CANCELED**.

      A Judgment dismissing this action will be filed contemporaneously herewith.

      This the 24th day of February, 2025.

_____
United States District Judge